## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**TRACY LYNNMARIE LOWER,**                    Case No. 1:19 CV 2071

      Plaintiff,                                Judge James Gwin

      v.                                       Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Tracy Lynnmarie Lower ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated September 10, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings consistent with this opinion.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in October 2013, alleging a disability onset date of October 1, 2011[1]. (Tr. 207-11, 212-16). Her claims were denied initially and upon reconsideration. (Tr. 132-33, 141-43, 151-52, 155-56). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on January 12, 2016. (Tr. 42-62). On January 29,

---

1. The alleged onset date in the DIB application is September 30, 2011. (Tr. 209). In his opinion, the ALJ uses October 1, 2011, the alleged onset date in the SSI application. *See* Tr. 893.

2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 27-36). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff filed suit in the United States District Court for the Southern District of Ohio which ordered the case be remanded under Sentence Four of 42 U.S.C. § 405(g). (Tr. 991-99); *Ehrlich v. Comm'r of Soc. Sec*., 2018 WL 442329 (S.D. Ohio 2018). After a second hearing on May 8, 2019 (Tr. 913-39), the ALJ found Plaintiff not disabled in a written decision dated July 5, 2019 (Tr. 893-904). Plaintiff timely filed the instant action on September 9, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1969, Plaintiff was 41 years old on her alleged onset date. *See* Tr. 209.

*January 2016 Hearing*

Plaintiff last worked in 2011 as a housekeeper. (Tr. 47-48). She could no longer work due to carpal tunnel syndrome and rheumatoid arthritis in her hands, knees, hips, and feet. (Tr. 48). Plaintiff had surgery on her hands and right elbow because she "d[idn't] have much control over them"; the hand surgery helped, the elbow surgery did not. (Tr. 49-50).

Plaintiff could carry a gallon of milk with two hands. (Tr. 50). She could pick up objects weighing approximately twenty pounds with assistance but could not carry them long distances. *Id*. She could sit for a "[h]alf hour, tops". (Tr. 52). Plaintiff treated her pain with over-the-counter medications. *Id*.

Plaintiff could perform household chores, though someone else usually finished them for her due to pain. (Tr. 55).

*May 2019 Hearing*

Plaintiff testified she was unable to work due to "[a] lot of pain", carpal tunnel syndrome, endometriosis, and nerve damage. (Tr. 917). She had chronic pain in her back, hip, and legs and numbness in her hands. *Id*. Plaintiff had trouble grasping objects due to limited sensation in her fingers and hands. *Id*. She had limited overhead reaching with her right arm, limited pushing and pulling abilities, and forward reaching was okay "to a point". (Tr. 918). Plaintiff's pain limited her ability to bend over or stoop; there were days her balance was off, though this was not a "constant thing". (Tr. 923). Her worst pain was the "whole right side" of her body including her hands, elbow, shoulder, back, hip, and legs. (Tr. 926).

As far as mental health conditions, Plaintiff suffered from "[d]epression. That's about it." (Tr. 923). She did not see a counselor or therapist because she did not have insurance. *Id*. When she had insurance, Plaintiff tried anti-depressant medication. (Tr. 931) Plaintiff did not like "dealing" with the public, she did not have the patience and would rather be alone. *Id*.

In a typical day, Plaintiff woke, smoked cigarettes, and helped her husband make their bed. (Tr. 930). Her son helped her wash dishes; he swept or mopped and carried the laundry. *Id*. Plaintiff prepared dinner and her son placed it in the oven. *Id*.

Relevant Medical Evidence

*Physical Health Records*

*Prior to Alleged Onset Date*

An April 2010 MRI of Plaintiff's lumbar spine revealed mild to moderate degenerative disc disease at L1-L2 and mild degenerative changes through the rest of her lumbar spine. (Tr. 300-01). The MRI showed other mild to moderate findings including disc bulges and facet arthropathy. (Tr. 301). Plaintiff treated at the emergency room in August for acute low back pain

3

(Tr. 442-44). Providers gave pain medication and instructed her to follow-up with her primary care physician. (Tr. 444).

A September 2010 lumbar MRI revealed mild degenerative changes in Plaintiff's lumbar spine. (Tr. 461). A February 2011 right wrist MRI revealed no acute findings. (Tr. 472). A July 2011 right hip MRI revealed no acute injury and normal alignment. (Tr. 477).

*After Alleged Onset Date*

In October 2013, Stephen Choban, M.D., performed a cubital tunnel decompression with right medial epicondylectomy. (Tr. 801).

In January 2014, Plaintiff underwent a consultative examination with Herbert Grodner, M.D. (Tr. 591-94). Dr. Grodner found Plaintiff to have a normal gait without ambulatory aid; she also had normal heel and toe walking, normal reflexes, and full strength in all muscle groups. (Tr. 592). She had decreased range of motion and tenderness to palpation in the lumbar spine. *Id*. Plaintiff had a positive straight leg test on the right as well as tender points. (Tr. 592-93). Dr. Grodner also observed decreased sensation in the medial nerve of the right upper extremity and a positive Tinel's sign. (Tr. 593). He noted Plaintiff "does have tender points consistent with fibromyalgia." (Tr. 594).

An August 2014 MRI of the lumbar spine revealed mild multilevel degenerative disc changes throughout the lumbar spine, aside from sparing at the L4-L5 level. (Tr. 786). This resulted in L2-L3 and L3-L4 minimal bilateral foraminal narrowing, without significant central spinal canal stenosis at any level. *Id*.

In September 2014, Plaintiff began treating with Robert Gould, D.O., for generalized right-sided pain in the thoracic region, low back pain which radiated to the right leg, and right arm discomfort. (Tr. 781). On examination, Dr. Gould found 5/5 motor function and a symmetric

4

sensory response to light touch; Plaintiff had a positive right-side straight leg raise with pain that radiated to the foot. (Tr. 782). Dr. Gould found palpatory tenderness over the lower lumbar spine, worse on the right side; Plaintiff had generalized pain throughout her body "consistent with fibromyalgia as tender points." *Id*. Range of motion, flexion, and extension aggravated her symptoms. *Id*. Dr. Gould diagnosed fibromyalgia, low back pain, lumbar radiculopathy and spondylosis. *Id*. Dr. Gould scheduled an epidural steroid injection and referred her to pain counseling. *Id*. Plaintiff underwent the epidural steroid injection later that month. (Tr. 762).

Plaintiff returned to Dr. Gould in October reporting no relief from the injection. (Tr. 756). She "appear[ed] to be in a moderate level of distress"; she ambulated independently. *Id*. Dr. Gould continued Plaintiff's previous diagnoses, added a diagnosis of cervicalgia, and recommended a cervical MRI. *Id*. The cervical spine MRI performed the following month revealed "relatively mild degenerative changes" through the cervical spine. (Tr. 748-49).

Plaintiff returned to Dr. Gould in January 2015 for back, neck, and right shoulder pains. (Tr. 740). Plaintiff could ambulate independently; she had significant pain with generalized range of motion in her neck. *Id*. She had an unremarkable Spurling's maneuver, only causing pain to the elbow. *Id*. Any movement aggravated Plaintiff's right shoulder pain; Neers-Hawkins maneuver, empty can test, and Speed sign were all positive. *Id*. Dr. Gould continued Plaintiff's diagnoses and prescribed medication. *Id*.

Plaintiff treated with Robert Gnade, M.D., in February 2015; she reported severe right flank pain and mid-epigastric pain. (Tr. 1244). Dr. Gnade observed she was "literally writhing in her chair" and sent her to the emergency room. *Id*. At the hospital, Plaintiff reported abdominal pain and vomiting. (Tr. 735). Hospital providers diagnosed abdominal pain and hematuria and prescribed pain and anti-nausea medications. (Tr. 737).

Plaintiff returned to Dr. Gnade in June 2015, "not doing well". (Tr. 1241). She was "flighty", forgot things, and had chronic fatigue and muscle pain. *Id*. Plaintiff reported that Dr. Gould took her off one of her medications because she did not have fibromyalgia. *Id*. Dr. Gnade prescribed a new medication. *Id*. Later that month, Plaintiff reported her pain medications were not working. (Tr. 1240). Dr. Gnade prescribed pain creams and recommended she follow up with a rheumatologist. *Id*. In July, Plaintiff was doing "well", but had hip pain radiating to her right leg. (Tr. 1239). By August, Plaintiff was "overall doing fairly well", but complained of nonspecific joint pain and restless legs. (Tr. 1238).

In October 2015, Plaintiff returned to Dr. Gnade "overall not doing too well." (Tr. 1237). She explained that her pain management specialist took her off all medications, limiting her to anti-inflammatories. *Id*. Plaintiff reported pain under her right foot. *Id*. Dr. Gnade suspected a Morton's neuroma and referred her to a podiatrist. *Id*.

In November, Plaintiff saw Dr. Choban for right hip trochanteric bursal pain; he administered a Kenalog injection. (Tr. 1205). Later that month, Plaintiff reported "not doing very well" to Dr. Gnade. (Tr. 1331). Dr. Gnade assessed severe fibromyalgia, chronic headache pain, chronic gastritis, and "problems with anemia". *Id*. He refilled Plaintiff's medications. *Id*.

Plaintiff treated with podiatrist Samantha Bark, D.P.M., in December 2015 for right foot pain. (Tr. 852-53). Dr. Bark diagnosed tarsal tunnel syndrome and generalized nerve disorder; she sent Plaintiff for an EMG of both lower extremities to see if the pain originated in her back. (Tr. 853). A January 2016 EMG revealed a "subtle abnormality" in "very mild acute bilateral S1 radiculopathies". (Tr. 1288). There was no evidence of peripheral neuropathy, polyneuropathy, or tarsal tunnel syndrome. *Id*.

6

Plaintiff returned to Dr. Choban in January 2016 for a recurrence of her right lateral hip pain and new left shoulder pain. (Tr. 1203). On examination, Plaintiff had limited forward flexion, abduction, and internal rotation of her left shoulder. *Id*. Dr. Choban performed a subacromial bursa injection and ordered an MRI of her hip. *Id*.

A February 2016 MRI of Plaintiff's right hip taken revealed mild osteoarthritis in the right hip and sacroiliac joints bilaterally. (Tr. 1341). There was also a "chronic appearing moderate grade partial-thickness tear of the distal right gluteus minimus tendon at its insertion on the greater trochanter with [] adjacent mild peritendinitis." *Id*. Plaintiff saw Dr. Choban following the MRI, she reported her left shoulder pain was "tolerable". (Tr. 1201). Dr. Choban diagnosed trochanteric bursitis of the right hip and a coracoid impingement of the left shoulder. *Id*. He performed a trochanter steroid injection. *Id*.

An August 2016 DEXA scan revealed osteopenia of the femoral neck. (Tr. 1343).

In March 2017, Plaintiff was not sleeping well due to poor pain management. (Tr. 1314). Dr. Gnade was "not sure where to go with her" and adjusted her medications. *Id*. Later that month, she was "overall doing fairly well" and came to Dr. Gnade for right knee instability. (Tr. 1313). He was "unable to really nail down what exact diagnosis she has" and observed that [.] "she does not seem to respond to any medication whatsoever." *Id*.

Neurologist Eric Arce, M.D., evaluated Plaintiff in July 2017. (Tr. 1274-76). Plaintiff reported, *inter alia*, a history of migratory numbness and weakness. (Tr. 1274). On examination, Dr. Arce found Plaintiff in no acute distress with normal attention and concentration. (Tr. 1275). Her recent and remote memory were normal. *Id*. She had no sensory deficits (Tr. 1275), a careful gait, normal range of motion, and no abnormal movements or tremors (Tr. 1276). Plaintiff had "giveaway weakness" in all muscles. *Id*. Her sensory exanimation was normal. (Tr. 1276-77). Dr.

Arce found "her symptoms are most likely not related to a neurological diagnosis" and believed additional neurological testing was unnecessary. (Tr. 1274).

Plaintiff treated at the emergency room in August 2018 for right flank pain. (Tr. 1279-80). Her review of systems was negative for back or major joint pain. (Tr. 1280). On examination, the provider found normal range of motion in all major joints with moderate right flank tenderness. (Tr. 1282). A physician diagnosed acute ureterolithiasis and prescribed medication. (Tr. 1285).

*Mental Health Records*

Plaintiff attended a consultative examination in January 2014 with James Tanley, Ph.D. (Tr. 600-04). Plaintiff identified numerous physical health conditions as her "chief complaint". (Tr. 600). She provided her personal, educational, occupational, and physical medical history to Dr. Tanley. (Tr. 600-01). When asked for behavioral history, Plaintiff noted she had only seen a mental health professional for a "pre-surgery evaluation"; she stated: "My feelings are alright. It's just another day." (Tr. 601). In a typical day, Plaintiff woke "anywhere from 10 a.m. to 6 p.m.". *Id*. She showered, made the bed, washed dishes, and did laundry. Plaintiff started her household chores, but could not finish them due to pain. *Id*. She did not belong to any social groups and had no hobbies; Plaintiff watched television and read books. *Id*.

On examination, Dr. Tanley found Plaintiff was generally cooperative with adequate speech and coherent, relevant, and goal-oriented thoughts. (Tr. 602). Her affect was appropriate to her thought content; she had unremarkable psychomotor activity and did not present anxiety symptoms. *Id*. Plaintiff was alert and oriented, had intact recent and remote memory, and displayed an "average" level of intellectual functioning. *Id*. Dr. Tanley diagnosed somatic symptom disorder (mild). (Tr. 603).

At a September 2014 appointment for back pain with Dr. Gould, he noted Plaintiff was alert and cooperative with a blunted mood and affect. (Tr. 782). She appeared to be in "moderate" distress. *Id*. He referred Plaintiff to pain counseling "to help with the depressive component of her pain." *Id.*

In October 2014, Dr. Gould found Plaintiff alert and cooperative with a normal mood and affect. (Tr. 756).

In January 2015, Dr. Gould found Plaintiff alert and cooperative with a normal affect and mood. (Tr. 740). She appeared to be in a "moderate to severe" level of distress. *Id*.

In October 2016, Plaintiff reported to Dr. Gnade she recently had a somatoform attack while traveling to North Carolina. (Tr. 1321). He noted he "really [thought] [he] need[ed] to get [her] back on her bipolar meds" and prescribed medication. *Id*. Weeks later, she returned to Dr. Gnade "still very much overall depressed". (Tr. 1320). Dr. Gnade adjusted her medications. *Id*. By November, Plaintiff reported the Wellbutrin was not helpful. (Tr. 1319). He diagnosed bipolar disorder and severe depression and adjusted Plaintiff's medications. *Id*.

In January and April 2017, Plaintiff reported to Dr. Gnade that she was "not doing very well." (Tr. 1220, 1217). Dr. Gnade adjusted her medications at each visit. *Id*.

Plaintiff presented as "somewhat depressed" to Dr. Gnade in February 2018. (Tr. 1304). He noted her past medications were not helpful and introduced samples of new prescriptions to see if they helped. *Id*.

At her August 2018 emergency room visit, doctors found Plaintiff tearful and anxious on examination. (Tr. 1282). She was alert and oriented with an anxious mood and reactive affect. *Id*.

Opinion Evidence

*Physical*

In November 2013, Dr. Gnade completed a Residual Functional Capacity Questionnaire. (Tr. 588-89). Therein, he listed Plaintiff's diagnoses and symptoms. (Tr. 588). He opined Plaintiff would need to lie down or recline during her workday in excess of typical breaks. *Id*. Plaintiff could not walk a city block; she could sit for thirty minutes at one time or stand/walk for five minutes at one time. *Id*. She could sit or stand/walk for a total of one hour each in an eight-hour workday. *Id*. Plaintiff required a job where she could shift positions at will and take unscheduled breaks, each lasting two to three hours during her workday. *Id*. She could occasionally[2] lift less than ten pounds and never lift ten pounds or more. (Tr. 589). Plaintiff could not grasp, turn, or twist objects with either hand, nor reach with either arm. *Id*. She could engage in fine manipulation twenty perfect of her workday. *Id*. Dr. Gnade opined Plaintiff would be absent more than four days per month due to her symptoms, was not a malingerer, and was not physically capable of working an eight-hour day on a sustained basis. *Id*.

In January 2014, Dr. Grodner opined Plaintiff "would have some difficulty with weight bearing activities." (Tr. 594). He elaborated that "her major problem is her lumbar discogenic disease so prolonged weight bearing such as standing, walking, repetitive bending or lifting, repetitive climbing of stairs, scaffolding, or ladders would be difficult." *Id*. Dr. Grodner noted, though Plaintiff "may have some difficulty in repetitively using her right hand because of her carpal tunnel syndrome", but he "d[id not] think this would be a significant problem." *Id*. Dr. Grodner recognized a history of depression, but felt the diagnosis "needs to be evaluated by the

---

2. The form defines "occasionally" as "less than 1/3 of the 8-hour workday." (Tr. 589).

appropriate specialist to assess its impact on the ability to perform daily activities." *Id*. He opined Plaintiff "could attempt sedentary activity." *Id.*

State agency physician Maureen Gallagher, D.O., reviewed Plaintiff's records and offered a physical assessment in January 2014. (Tr. 74-75). She found Plaintiff could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds. (Tr. 74). She could stand and/or walk or sit for approximately six hours each in an eight-hour workday. *Id*. Plaintiff was unlimited in her ability to push and/or pull (other than as limited for lift and/or carry). *Id*. She could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (Tr. 74-75). She could never climb ladders, ropes, or scaffolds. (Tr. 74). Plaintiff had a limited ability to reach frontally, laterally, or overhead with her right arm. (Tr. 75). She was also limited in gross manipulation ("handling") with her right hand, but had no limitations in feeling or fingering. *Id*. In May 2014, State agency reviewing physician Leanne Bertani, M.D., concurred with most of Dr. Gallagher's findings except she limited Plaintiff to four hours of standing and/or walking. (Tr. 105). Dr. Bertani also differed when she found Plaintiff was limited in her ability to push or pull with her legs, had an unlimited ability to reach, and had a limited ability to handle and finger bilaterally. (Tr. 105-06). Dr. Bertani also opined Plaintiff should avoid concentrated exposure to vibration and hazards such as machinery and heights due to her antalgic gait and elevated BMI. (Tr. 107).

Dr. Gnade completed a second opinion in November 2014. (Tr. 631-32). Therein, he again listed Plaintiff's diagnoses and symptoms. (Tr. 631). He opined Plaintiff would need to lie down or recline during her workday in excess of typical breaks. *Id*. Plaintiff could walk less than one city block; she could sit for forty-five minutes at one time and stand/walk for twenty minutes at one time. *Id*. She could sit for a total of three hours and stand/walk for a total of two hours in an eight-hour workday. *Id*. Plaintiff needed a job where she could shift positions at will and take six

11

to eight unscheduled breaks per day, each lasting fifteen to sixty minutes. *Id*. She could frequently[3] lift ten pounds or less, occasionally[4] lift twenty pounds, and never lift fifty pounds or more. (Tr. 632). Plaintiff could grasp, turn, or twist objects with either hand fifteen percent of her workday and reach with either arm thirty percent of the workday. *Id*. She could engage in fine manipulation five percent of her workday. *Id*. Dr. Gnade opined Plaintiff would be absent three or four days per month due to her symptoms, was a malingerer, and was not physically capable of working an eight-hour day on a sustained basis. *Id*.

*Mental*

As part of her January 2014 consultative examination, Dr. Tanley noted Plaintiff "had no difficulty understanding the task requirements of today's [consultative examination]" and estimated her intellect to be in the "[a]verage" range; Dr. Tanley opined that "this is what would be expected of her in a work setting." (Tr. 603). She found Plaintiff's abilities in maintaining attention and concentration, persistence and pace, was "unimpaired throughout the entire [consultative examination]". (Tr. 604). This, combined with an "average" intellect led Dr. Tanley to opine Plaintiff "would be expected to show little or no difficulty with tasks of increasing complexity and multistep tasks." *Id*. Dr. Tanley noted, however, that should her pain and somatic symptom disorder worsen, they would negatively impact Plaintiff's attention, concentration, persistence, and pace abilities. *Id*. The disorder "could exert a bit of a negative impact" or "effect" on Plaintiff's ability to respond appropriately to supervision and coworkers or work pressures. *Id*.

---

3. The form defines "frequently" as "1/3-2/3 of the 8-hour workday". (Tr. 632).

4. The form defines "occasionally" as "less than 1/3 of the 8-hour workday." (Tr. 589).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 932-38. The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and vocational background who was limited in the ways he ultimately determined Plaintiff to be. (Tr. 933-34). The VE opined that such an individual could perform work as a sorter, machine tender, or a table worker. (Tr. 934).

ALJ Decision

In a decision dated July 9, 2019, the ALJ concluded Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016 and had not engaged in substantial gainful activity since October 1, 2011 (her alleged onset date). (Tr. 895). The ALJ found she had severe impairments of: lumbar degenerative disc disease with stenosis and radicular symptoms; fibromyalgia; rheumatoid arthritis; bilateral carpal tunnel syndrome; gastroesophageal reflux disease status post gastric bypass surgery and obesity. (Tr. 896).[5] The ALJ found none of Plaintiff's impairments (alone or in combination) met or equaled the severity of a listed impairment. (Tr. 897). Next, the ALJ concluded Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can frequently operate foot controls; occasionally push and pull limited per exertional weight limits with upper extremities; never climb ladders, [ropes] or scaffolds; occasionally climb ramps or stairs; balance, stoop, kneel, crouch and crawl; occasionally reach overhead with the right upper extremity; frequently finger, handle and feel; occasionally be exposed to extreme cold; have no use of moving, hazardous or heavy machinery; no exposure to unprotected heights and no exposure to concentration vibration.

---

5. The ALJ further found Plaintiff's "medically determinable mental impairment of somatic symptom disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (Tr. 896).

(Tr. 898). He determined Plaintiff could not perform her past relevant work and was defined as a younger individual on her alleged onset date. (Tr. 902). Considering Plaintiff's age, education, experience, and RFC, the ALJ concluded there were jobs that existed in the national economy she could perform. *Id*. Thus, he determined Plaintiff was not under a disability from her alleged onset date through the date of the decision. (Tr. 903).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

14

than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises three objections to the ALJ's decision. She contends the ALJ erred in evaluating: (1) her depression and bipolar disorder at Step Two and at each subsequent stage; (2) her fibromyalgia diagnosis and; (3) the opinions of Drs. Grodner, Gnade, and the State agency physicians. For the reasons contained herein, the undersigned finds the ALJ's decision

15

unsupported by substantial evidence and recommends the decision be reversed and remanded for further proceedings.

Step Two

Plaintiff first argues the ALJ erred in his consideration of her depression and bipolar disorder. She argues that the ALJ was required to consider the conditions at all stages of the sequential process and did not do so. The undersigned agrees and finds remand is necessary here.

At Step Two of the disability analysis, the ALJ determines whether a claimant has a medically determinable impairment (or a combination of impairments), that is "severe". 20 C.F.R. §§ 404.1520(a), 416.920(a). By definition, a "severe" impairment is one that "significantly limit[s] your physical or mental ability to do basic work activities". 20 C.F.R. §§ 404.1520(c), 416.920(c). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009) (quoting SSR 96-8p, 1996 WL 374184, at *5) (emphasis added). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider *all* of the limitations caused by the claimant's impairments – severe and not. When an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Id.* at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

At Step Two, the ALJ found Plaintiff had severe impairments, all of them physical. (Tr. 896). Because he found a severe impairment, the ALJ was then required to "consider limitations and restrictions imposed" by Plaintiff's non-severe impairments beyond Step Two – including

depression and bipolar disorder. SSR 96-8p, 1996 WL 374184, at *5. A review of the ALJ's decision here reveals that he did not.

The Commissioner acknowledges the ALJ's failure but contends there is no error because he expressly considered the record as a whole, including Dr. Grodner's benign psychological examination findings. (Doc. 14, at 10-11). Preliminarily, the undersigned notes Dr. Grodner did not perform a psychological evaluation – Dr. Tanley did. *See* Tr. 600-06. Even so, Dr. Grodner, the physical examiner, recognized Plaintiff experienced depression and expressly recommended she see a psychological professional who could better "assess its impact on the ability to perform daily activities." (Tr. 594). Turning to Dr. Tanley, his psychological examination and opinion was proffered in 2014. (Tr. 600-04). Important here, the record contains Plaintiff's complaints of depression and failed pharmaceutical treatments in the years *since* Dr. Tanley's examination. *See* Tr. 1319-21 (2016 visits with Dr. Gnade where Plaintiff reported depression and he adjusted her medications with limited success); Tr. 1220, 1217 (2017 visits with Dr. Gnade where Plaintiff reported persistent, uncontrolled depression); Tr. 1304 (2018 visit with Dr. Gnade where he found she did not respond to psychotic medication). The ALJ did not discuss these records. Further, there is also no evidence within the RFC the ALJ considered them as he did not offer any mental functional limitations. *See* Tr. 898.

For these reasons, the undersigned recommends the ALJ's decision be reversed in this regard so that the ALJ may properly consider Plaintiff's bipolar disorder and depression through the evaluation process.

Fibromyalgia and Dr. Gnade

Plaintiff next argues the ALJ failed to properly evaluate her fibromyalgia diagnosis and, relatedly, improperly discounted the November 2014 opinion of her treating physician Dr. Gnade

which based his functional limitations on the diagnosis. (Doc. 12, at 18-20, 25) (citing Tr. 631-32). The undersigned finds the ALJ's decision is unsupported in both instances and recommends the decision be reversed.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007) (quoting Stedman's Medical Dictionary for Health Professionals and Nursing, 542 (5th ed. 2005)); *see also* SSR 12-2p, 2012 WL 3104869, at *2 (fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months"). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion." *Preston*, 854 F.3d at 818.

This makes the credibility determination particularly relevant where a claimant has been diagnosed with fibromyalgia. "[O]pinions that focus solely upon objective evidence are not particularly relevant" due to "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245. Cases involving fibromyalgia "place[] a premium . . . on the assessment of the claimant's credibility." *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003). This is so because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs."

*Rogers*, 486 F.3d at 243. "Nonetheless, a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008). "Some people may have a severe case of fibromyalgia as to be totally disabled form working but most do not, and the question is whether claimant is one of the minority." *Id.* at 806.

 Social Security Ruling 12–2p (entitled "Evaluation of Fibromyalgia") "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims . . . ." 2012 WL 3104869, at *1. The Ruling states that fibromyalgia should be analyzed under the traditional five-step evaluation process used for analyzing other claims for disability. *Id.* at *5–6.

Here, the ALJ found fibromyalgia to be a severe impairment at Step Two (Tr. 896) and, at Step Three, cited SSR 12-2p (Tr. 898). The ALJ does not devote any other part of his opinion to analyzing fibromyalgia specifically, other than recognizing the diagnosis. (Tr. 900). This itself is not error, but the Court is now tasked with examining how – or if – the ALJ properly considered the diagnosis. As noted, the logical place to start is the credibility finding, as fibromyalgia does not typically present through objective findings.

In assessing credibility, the ALJ recognized Plaintiff's chronic pain but found her statements regarding the intensity, persistence, and limiting effects of her symptoms "inconsistent with generally mild findings on imaging and diagnostic testing and physical examination findings." (Tr. 899). He found "[a]n analysis of the objective medical evidence" demonstrated Plaintiff could perform sedentary work. *Id*. The ALJ then went on to detail MRI and EMG findings. (Tr. 899-900). Through this assessment, it is clear the ALJ relied on, and did not look beyond, objective evidence in considering Plaintiff's fibromyalgia diagnosis – even when assessing her credibility. Remand is thus required.

The ALJ also evaluated the opinion of Dr. Gnade, Plaintiff's treating physician who gave the diagnosis of, and treated, her fibromyalgia. The ALJ found:

> Little weight is given to the opinion of Robert Gnade, M.D., the claimant's primary care provider, who opined that the claimant is limited to less than a full range of sedentary work activity and is incapable of sustaining such work activity on a regular and continuing basis (Exhibits 12F, 17F). Dr. Gnade's opinion is inconsistent with generally mild findings on imaging and diagnostic testing, physical examination findings and his own clinical observations (Exhibits 11F/9, 13F, 14F, 21F, 22F, 27F).

(Tr. 901).

Here, the ALJ dismissed Dr. Gnade's opinion – which was based upon Plaintiff's fibromyalgia diagnosis and related symptoms (Tr. 631-32) – because it was inconsistent with imaging, examinations, and clinical observations. As explained, it is improper for the ALJ place such emphasis on objective evidence when evaluating a claimant with a fibromyalgia diagnosis. "The Sixth Circuit has issued strong opinions on this point, in one case reversing a district court's decision to affirm the ALJ's denial because of the ALJ's undue emphasis on the lack of objective evidence." *Cooper v. Comm'r of Soc. Sec.*, 2014 WL 4606010, at \*16 (E.D. Mich.) (citing *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011)) ("[T]he ALJ's rejection of the treating physicians' opinions as unsupported by objective evidence in the record obviously stems from his fundamental misunderstanding of the nature of fibromyalgia."). Further, the ALJ dismissed Dr. Gnade's opinion as inconsistent with his clinical observations. A review of Dr. Gnade's treatment notes reveals this assessment is unsupported by evidence. Dr. Gnade consistently recorded Plaintiff's pain complaints, the struggle to nail down a diagnosis, and a myriad of prescription adjustments to try to bring the pain under control. *See* Tr. 740, 756 (Dr. Gould observed Plaintiff was in "distress" due to pain); Tr. 1244 (Dr. Gnade reported Plaintiff was "literally writhing in her chair" due to pain); Tr. 1241, 1237, 1331 (Dr. Gnade observed Plaintiff was "not doing well" due to pain); Tr. 1314 (Dr. Gnade noted poor pain management with

medication). For these reasons, the undersigned finds merit in Plaintiff's argument that Dr. Gnade's opinion was not properly considered in the fibromyalgia context.

Here, the ALJ gave no specific evaluation of the limiting effects of Plaintiff's fibromyalgia condition, relied solely on objective evidence in assessing her credibility, and improperly dismissed the opinion of the physician treating her fibromyalgia. Thus, remand is necessary for the ALJ to properly evaluate such.

Opinion Evidence

*Dr. Grodner*

Plaintiff next objects to the ALJ's evaluation of Dr. Grodner's opinion. (Doc. 12, at 22-23) (citing Tr. 594). She argues the ALJ erred in summarizing Dr. Grodner's opinion when he stated Plaintiff "would have some difficulty with weight bearing activities and repetitive use of her right hand while capable of sedentary work activity." (Doc. 12, at 22) (quoting Tr. 901). She argues Dr. Grodner's opinion actually encompassed more by specifically defining weight bearing activities as those involving "prolonged" standing, walking, bending, or lifting; or climbing ladders, stairs, or scaffolds. *Id.* However, just as "the ALJ need not expressly mention every piece of evidence", *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 250 (6th Cir. 2015), the ALJ need not repeat verbatim a physician's opinion when rendering an assessment, so long as the ALJ's decision is supported. Here, the undersigned concludes that it is.

An examining, but not treating, source is one who has examined Plaintiff, but did not have an ongoing treatment relationship. 20 C.F.R. §§ 404.1527, 416.927; SSR 96-2, 1996 WL 374188, at *1. Here, Dr. Grodner examined Plaintiff once for a physical assessment. (Tr. 591-94). The ALJ is required to weigh the opinion of agency examining physicians under the same factors as treating physicians, including the supportability and consistency of those opinions. *See* 20 C.F.R. §§

404.1527(c), 416.927(c). Although the explanatory "good reasons" requirement "does not apply to opinions from physicians who . . . have examined but not treated a claimant, the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011). Thus, the question is not one of "good reasons", but rather whether the ALJ's reasoning in this regard is supported by substantial evidence.

In evaluating the opinion, the ALJ concluded:

> The undersigned gives significant weight to the opinion of Dr. Grodner who opined that the claimant has some difficulty with weight bearing activities and repetitive use of her right hand while capable of sedentary work activity (Exhibit 13F). Dr. Grodner's opinion is well supported by his thorough physical examination, mild examination findings on imaging and diagnostic testing and is consistent with the record overall.

(Tr. 901).

The undersigned finds this explanation supported by substantial evidence. Here, Dr. Grodner offered a limited opinion, stating only that Plaintiff would have difficulty with "prolonged" weight bearing activities such as standing or walking, or any repeated climbing, lifting, or bending. (Tr. 594). He further opined Plaintiff would have difficulty repetitively using her right hand. *Id.* Due to these limitations, he concluded Plaintiff "could attempt sedentary activity." *Id.* The ALJ found Dr. Grodner's opinion supported by his examination findings and imaging. Such observations directly implicate the factor of supportability and are supported by substantial evidence. 20 C.F.R. §§ 404.1527(c), 416.927(c) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). For example, Dr. Grodner observed Plaintiff to have a normal gait without ambulatory aid, normal heel and toe walking, normal reflexes, and full strength in all muscle groups. (Tr. 592). However, she had decreased range of motion in the

22

lumbar spine and tenderness to palpation. *Id*. There was also a positive straight leg test in the right leg as well as tender points. (Tr. 592-93). This is not inconsistent with Dr. Grodner concluding she could attempt sedentary work without prolonged weight bearing activities. Dr. Grodner recognized Plaintiff's carpal tunnel issues and also observed decreased sensation in the medial nerve of the right upper extremity. (Tr. 593). Again, this is not inconsistent with his opinion that she would have difficulty with repetitive use of her right hand. To imaging, Dr. Grodner reviewed Plaintiff's EMG study, MRI, and x-rays (Tr. 593), he also conducted a thorough review of her medical history (Tr. 591-93). Because, as the ALJ explained, Dr. Grodner's opinions are adequately supported by his mild examination findings and the imaging he reviewed, the undersigned recommends the decision be affirmed in this regard.

Plaintiff argues the ALJ erred when he did not solicit another consultative examination to determine if the effects of Plaintiff's arthritis "caused a difference in limitations", citing *Gentry v. Commissioner of Social Security*, 2018 WL 4305213, at *5 (N.D. Ohio), to support the proposition that the ALJ was required to do so. (Doc. 12, at 23). *Gentry* is distinguishable, however. There, the Court concluded the ALJ improperly relied on outdated State agency opinions. *Gentry*, 2018 WL 4305213, at *4-5. The State agency physicians issued their opinions without the benefit of nearly two years of subsequent medical history which showed his condition worsened significantly. *Id*. However, as the Sixth Circuit has held, it is not *per se* error to rely on outdated opinions, so long as the ALJ considers the post-dated evidence in formulating his RFC. *See, e.g.*, *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (ALJ did not improperly rely upon state-agency physicians' opinions where they were out of date where it was clear ALJ considered the medical examinations that occurred after the opinions were rendered and took into account any changes). The ALJ did so here. *See* Tr. 899-01.

23

For these reasons, the undersigned finds no error here and recommends the ALJ's decision be affirmed in this regard.

*State Agency Physicians*

Plaintiff devotes a section of her brief to discussing the State agency physician opinions, however, the undersigned finds that Plaintiff does not explain what – if anything – is wrong with the ALJ's evaluation thereof. (Doc. 12, at 24). Plaintiff notes the ALJ assigned "some weight" to the opinions yet does not allege how this is error. She cites a 2016 MRI and case law but does not explain how they show a conflict between the opinions and RFC.

Because Plaintiff failed to develop an argument on this issue, the undersigned deems it waived and finds no error. *See Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) ("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB not supported by substantial evidence and recommends the decision be reversed and remanded pursuant to Sentence Four of 42 U.S.C. § 405(g). On remand, the ALJ should fully consider Plaintiff's depression and bipolar diagnoses at Step Two and beyond, and properly examine the impact and limiting effects of her fibromyalgia diagnosis beyond the objective evidence, including the opinion of Dr. Gnade.


 s/ James R. Knepp II
United States Magistrate Judge

24

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).